| | |
|---|---|
| **AMERICAN COLONIAL CAPITAL**<br>STEVEN M. KRIES (SBN 163550)<br>8059 S. Elk Way<br>Aurora, CO 80016<br>Telephone: (619) 890-0765<br><br>General Insolvency Counsel for Debtor and Debtor-in-Possession | **AKERMAN LLP**<br>EVELINA GENTRY (SBN 296796)<br>*evelina.gentry@akerman.com*<br>633 W. Fifth Street, Suite 6400<br>Los Angeles, California 90071<br>Telephone: (213) 688-9500<br>Facsimile: (213) 627-6342<br><br>MARK S. LICHTENSTEIN<br>*(Pro Hac Vice* forthcoming*)*<br>*mark.lichtenstein@akerman.com*<br>1251 Avenue of the Americas, 37th Floor<br>New York, NY 10020<br>Telephone: (212) 259 8707<br>Facsimile: (213) 627-6342<br><br>DAVID W. PARHAM<br>*(Pro Hac Vice* forthcoming*)*<br>*david.parham@akerman.com*<br>2001 Ross Avenue, Suite 3600<br>Dallas, TX 75201<br>Telephone: (214) 720 4345<br>Facsimile: (214) 981 9339<br><br>(Proposed) General Insolvency Counsel for Debtor and Debtor-in-Possession |

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>Newport Ventures, LLC<br><br>Debtor and Debtor-in-Possession. | Case No. 8:24-bk-12738-TA<br><br>Hon. Theodor C. Albert<br><br>**DECLARATION OF SHAHVAND ARYANA IN SUPPORT OF ALL OF THE DEBTOR'S "FIRST-DAY MOTIONS"**<br><br>Date: November 7, 2024<br>Time: 11:00 a.m.<br>Crtrm: 5B<br>Place: 411 W. Fourth Street,<br>        Santa Ana, CA 9270 |

I, Shahvand Aryana, hereby declare as follows:

---

1
CASE NO. 8:24-bk-12738-TA
**DECLARATION OF SHAHVAND ARYANA IN SUPPORT OF
ALL OF THE DEBTOR'S "FIRST-DAY MOTIONS"**

78592902;4

1. I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2. I am the managing member of Newport Ventures, LLC, a Colorado limited liability company, and the chapter 11 debtor and debtor in possession in the above-captioned chapter 11 bankruptcy case ("**Debtor**").

3. In my capacity as the managing member of the Debtor, I have access to the Debtor's books and records and am familiar with the organization, operations and financial condition of the Debtor. Any records and documents referred to in this declaration constitute writings taken, made, or maintained in the regular or ordinary course of the Debtor's business at or near the time of act, condition or event to which they relate by persons employed by the Debtor who had a business duty to the Debtor to accurately and completely take, make, and maintain such records and documents. The statements set forth in this declaration are based upon my own review and knowledge of the Debtor's books and records.

4. The Debtor filed a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**") on October 26, 2024 (the "**Petition Date**"). The Debtor is operating its business, managing its financial affairs and administering its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

### Debtor's Background

5. The Debtor was formed in South Dakota on March 9, 2020, as an investment vehicle to invest in QSR and related businesses. $55% Debtor is owned by Shahvand Aryana, 25% is owned by Ernie Abarro, 20% of the Debtor is owned by Kathy Aryana 20%. As of the Petition Date, the Debtor made one investment to purchase certain Del Taco franchises. Pursuant to the Del Taco investment, Debtor acquired 18 Del Taco Franchise restaurants located throughout Colorado (the "Franchises"). As set forth below, and directly resulting from the precipitous and wrongful actions of the franchisor, Del Taco, LLC (the

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**DECLARATION OF SHAHVAND ARYANA IN SUPPORT OF
ALL OF THE DEBTOR'S "FIRST-DAY MOTIONS"**

78592902;4

"Franchisor" of "Del Taco"), the Debtor was forced to seek refuge in Bankruptcy Court on an expedited basis.

6.  The Franchises purchased by Newport are located in the following Colorado cites: Lone Tree, Colorado Springs, Aurora, Lakewood, Englewood, Brighton, Firestone, Denver, Greeley, Centennial, Commerce City, Parker, and Castle Rock. The Debtor acquired the Franchises on October 4, 2023 for $14,102,596.40.  In connection with the purchase of the Franchises, Debtor entered into that certain Loan and Security Agreement (the "Loan"), dated September 5, 2023, with NBH Bank ("NBH" or "Secured Lender"), for a loan in the principal amount of $11,800,00 (the "Loan").  NBH Bank is the 100% participant in the Acquisition Loan and Auxilior Capital ("Aux") is the manager and collateral agent for the Loan. Of the Loan, $8,800,000 was for acquisition of the Franchises (the "Acquisition Loan") and $3,000,000, of the Loan was for the purpose allowing the Debtor to remodel stores, purchase new equipment, and develop/acquire new stores ("Development Line of Credit"). Pursuant to a Development Agreement entered into between Debtor and Franchisor covering the Colorado market (the "Development Agreement"), Debtor was to develop 10 new franchises in Colorado over a 10-year period in accordance with a development schedule.

7.  Shortly after the purchase, Debtor learned that the Franchises required greater equipment repairs, maintenance, and replacements than contemplated and labor issues related to the Franchisor. As a result of the poor condition of the assets that it acquired, Debtor was forced to expend cash which it had expected to use for operating reserves and franchise development on numerous and expensive equipment repairs, maintenance, and replacements and staffing.  For this reason, and due to software issues related to the Franchisor, Debtor fell behind on paying certain vendors and certain tax payments. As of the Petition Date, the Debtor is current in the payment of property taxes, and Debtor is in the process of bringing sales taxes current.  As discussed more fully below, the Debtor was forced to file for bankruptcy protection as a result of the Franchisor's hyper-aggressive and inappropriate actions.

**DECLARATION OF SHAHVAND ARYANA IN SUPPORT OF
ALL OF THE DEBTOR'S "FIRST-DAY MOTIONS"**

78592902;4

8.       On October 14, 2024, Debtor received a Notice of Default from the Franchisor alleging that Debtor was in default of its obligations under the terms of that certain Note in the amount of $125,000 issued by Debtor in favor of Franchisor in connection with a Development Fee owed by Debtor to Franchisor (the "Development Fee Note") which was due and payable on October 4, 2024.  Debtor was provided until October 17, 2024 to cure the default thereunder.

9.       On October 21, 2024, Franchisor issued to Debtor "Notice of Termination and Grant of Conditional Temporary License" (the "Termination Letter"). The Termination Letter purported to terminate Debtor's franchise agreements, and provided unilaterally for the issuance of a temporary license under which the Debtor was permitted to continue to operate the Franchises while the Franchisor reportedly would assess next steps regarding the Franchises, including the possible turnover of the Franchises to the Franchisor. The Termination Letter reserves the right to "earlier terminate the Temporary License for any reason with or without cause."  The Debtor disputes that the Franchise Agreements were properly terminated and believes they remain in full force and effect. Nonetheless, because the license purported to permit termination immediately without notice or an opportunity to cure, the Debtor had no choice but to file this bankruptcy case and avail itself of the automatic stay.

10.       Thus, in a case where the Debtor is generating over $25,000,000 in annual gross income as well as $2,800,00 annual net income, and the Secured Lender is owed approximately $11,600,00 and unsecured creditors are owed $1,300,000, the Franchisor seeks to effect a forfeiture of not only the significant investment of the Debtor's principals but also the rights of all other creditors of the Debtor based on the Debtor's failure to pay the $125,000 Future Development Fee Note for 10 new development stores. The patent unfairness of the Franchisor's attempted forfeiture strategy is exacerbated by the fact the Franchisor owes the Debtor at least $130,000 and also has selectively forced the Debtor to continue to participate in disastrous money losing discount programs leading to losses in excess of $280,000 per month which other franchisees are not being forced to participate in.

**DECLARATION OF SHAHVAND ARYANA IN SUPPORT OF
ALL OF THE DEBTOR'S "FIRST-DAY MOTIONS"**

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

78592902;4

11. Franchisor's oppressive administrative requirements have further created several significant issues that had a critical impact on the Debtor's ability to operate efficiently and more profitably. Despite the Debtor's efforts to resolve various issues with the Franchisor, no assistance or suitable resolution was offered. Among the numerous problematic issues are where Franchisor forced incompatible POS and payroll systems upon the Debtor. The incompatibility of the POS and payroll systems have led to operational inefficiencies and contributes to an estimated $280,000 loss of monthly revenue. Similarly, Franchisor imposes very restrictive control over pricing and promotions. The Franchisor-mandated menu and pricing updates for combo discounts have imposed additional financial burdens, resulting in an estimated $300,000 in monthly revenue losses. Franchisor mandates third-party delivery partnerships (including DoorDash, Uber Eats, and Grubhub) resulting in an approximate $680,000 deficiency in revenue due to unfulfilled payments and the Franchisor's intentional misapplication and misappropriation of continuum franchise fees and marketing fees collected.

**First Day Motions**

12. To further Debtor's restructuring efforts, Debtor has filed, contemporaneously with this Declaration, several "First Day" Motions summarized below. The Debtor respectfully requests that the Court consider entering the proposed orders granting the First Day Motions on an emergency basis.

13. I have reviewed the First Day Motions and the proposed orders (including the exhibits) and have determined that the facts set forth therein are true and correct to the best of my knowledge, information and belief. In addition, I believe that the relief sought in each of the First Day Motions (a) is vital to enable Debtor to make the transition to, and operate in, with minimal interruption or disruption to its business or loss of productivity or value, and (b) constitute a critical element of rejuvenating Debtor's operations, which is necessary to maximize value during the bankruptcy case for the benefit of all stakeholders.

78592902;4

14. **Cash Collateral**. Debtor is filing an Emergency Motion for (1) Authority to Use Cash Collateral on an Interim Basis (2) Granting Adequate Protection; (iii) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b); and (iv) Granting Related Relief (the "**Cash Collateral Motion**"). I have read the Cash Collateral Motion and am informed and believe it is true and correct in every material respect. In the Cash Collateral Motion, the Debtor requests authority to use Cash Collateral through November 21, 2024 on the terms set forth in the Cash Collateral Motion.

15. As set forth above on September 5, 2023, Debtor obtained a Loan in the amount of $12,200,000, at an interest rate of 9.25% per annum. Debtor's monthly obligation of approximately $146,000 commenced November 1, 2023. The balance of principal becomes payable on October 1, 2029. The Loan is secured by a blanket pledge of all of Debtor's assets.

16. Secured Lender's lien on the Cash Collateral, to the extent perfected, will be adequately protected with (i) a replacement lien against the Debtor's personal property assets and the proceeds thereof, to the same extent, priority and validity as the lien held as of the Petition Date, and subject to the same defenses and avoidance actions as those applicable to their respective liens as of the Petition Date, (ii) a super priority claim 11 U.S.C. §§ 503(b), 507(a)(2) and 507(b); monthly payments in the amount of: $94,041.67, among other elements of adequate protection..

17. Attached hereto as **Exhibit B,** and incorporated herein by this reference is a true and correct copy of the 67-day budget (the "Budget") for the period from the Petition Date through December 31, 2024. I am informed and believe that the Budget is based upon reasonable assumptions and conditions. Attached hereto as **Exhibit C** is true and correct copy of the Loan.

18. Debtor requires the use of Cash Collateral because it will preserve the value of Debtor's estate, to the benefit of all creditors, particularly because it is necessary that the Debtor demonstrate to its staff, vendors and customers that the Debtor can continue to function without interruption and

**DECLARATION OF SHAHVAND ARYANA IN SUPPORT OF
ALL OF THE DEBTOR'S "FIRST-DAY MOTIONS"**

78592902;4

pay vendors in the ordinary course of business. Absent such a showing—and in the event of any interruption or delay in the business—the Debtor's customers will likely move their business to Debtor's competitors, and staff will likely pursue opportunities with competitors, which would cripple the Debtor's business.

19.  **Cash Management**. The Debtor is filing an Emergency Motion for Entry of an Order Authorizing (i) Maintenance of Existing Bank Accounts, and (ii) Continued Use of Existing Cash Management System (the "**Cash Management Motion**").  I have read the Cash Management Motion and am informed and believe that it is true and correct in every material respect.

20.  As set forth in the concurrently filed **Exhibit D**, the Debtor maintains Accounts with Wells Fargo, N.A. ("Wells Fargo"). Debtor holds twenty-two (22) Wells Fargo Accounts (the "Wells Fargo Accounts") consisting of 18 business accounts, one for each of Debtor's locations, one (1) general business account ending in 9805 for Debtor's general operation (the "General Operating Account"), one (1) payroll and tax account ending in 3879 (the "Payroll and Tax Account"), one (1) merchant account (the "Merchant Account"), and one (1) account for Debtor's accounts payable (the "Accounts Payable Account").

21.  Between the 18 cash deposit accounts and the Debtor's Merchant Account the Debtor receives $430,000 to $480,000 per week. Generally, on a daily basis, each of these Accounts is drawn to Debtor's General Account. The General Account is transferred to the Payable Operating Account/Payroll & Tax Accounts. The Payables Operating Account maintains an average balance of $75,000.  The Payables Operating Account/ Payroll & Tax Accounts are used to make disbursements, pay for Debtor's day-to-day operating expenses. Debtor's bi-weekly payroll and payroll & sales tax obligations are funded through Debtor's Payroll and Tax Account.

22.  When a customer pays with a credit card at any of Debtor's locations, the funds are temporarily deposited into Debtor's Merchant Account. The Account provider then processes the transaction, deducts any fees and transfers the remaining funds to Debtor Merchant Account.  All of

Debtor's suppliers for goods or services for the 18 Locations are paid through the Debtor Payables Account.

23. Without the ability to conduct these transactions, each location is at risk of failing. Second, without the Accounts, Debtor will not be able manage its business as an ongoing concern. Third, because of Debtor's filing, Debtor's use of these Accounts has been restricted. Debtor's financial operations are halted, placing Debtor's operations at risk. Any additional interruption will be catastrophic.

24. The relief requested herein will (1) ensure that there is no disruption to Debtor's receipt of revenues and (2) that Debtor's employees are timely paid. In contrast, enforcing the U.S. Trustee's requirements without modification would significantly disrupt Debtor's business. Indeed, Debtor's current circumstances demonstrate that the Accounts cannot be immediately closed without substantial risks and disruption to Debtor's operations. The Accounts are integral components of Debtor's system to centrally manage cash collection and disbursements.

25. Therefore, the Debtor request authority to use its existing business forms and print "Debtor-in-Possession" on any such forms, 30-days after the Court enters an order. Debtor further requests that the Court authorize and direct the Wells Fargo to receive, process, honor and pay any and all checks, wire transfers, credit card payments, ACH payments and other instructions, and drafts payable through, or drawn or directed on, the Accounts after the Petition Date by holders, makers or other parties entitled to issue instructions with respect thereto, irrespective of whether such checks, drafts, wires, credit card payments, or ACH payments are dated prior or subsequent to the Petition Date, consistent with any order of the Court and governing law; provided, however, that Debtor will issue a stop payment order on any check or draft drawn, issued or otherwise presented prior to the Petition Date so they will not be honored by the Bank except to the extent authorized by order of the Court.

**AKERMAN LLP**
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

8
CASE NO. 8:24-bk-12738-TA

**DECLARATION OF SHAHVAND ARYANA IN SUPPORT OF
ALL OF THE DEBTOR'S "FIRST-DAY MOTIONS"**

78592902;4

26. **Insurance Motion**. In the ordinary course of business, the Debtor maintains one (1) insurance policy[1], a summary schedule of which is attached hereto as **Exhibit E** (the "Insurance Policy"), that is administered by a third-party insurance carrier (the "Insurance Carrier"). The Insurance Policy provides general liability, automobile coverage, and property coverage, among other things. The Insurance Policy is essential to the ongoing operation of the Debtor's business. The annual premium for the Insurance Policy is approximately $160,165.56, plus applicable taxes and surcharges.

27. The Insurance Policy is an annual policy that renews throughout the year based on when the policy was originally purchased. The Debtor believes that $13,347.73 is due on account of the Insurance Policy as of the Petition Date. Continuation and renewal of the Insurance Policy, and entry into new Insurance Policy, as needed, is essential to the preservation of the value of the Debtor's business. Accordingly, the Debtor requests authority to maintain its existing Insurance Policy, pay prepetition obligations related thereto, and enter into new Insurance Policy in the ordinary course of business.

28. **Critical Vendor Motion**. Debtor seeks entry of an order authorizing (but not requiring) it to pay the prepetition claims of certain of its vendors and creditors who, in reasonable exercise and Debtor's business judgment, the Debtor deems to be critical and essential to the uninterrupted functioning of the Debtor's business operations. Specifically, the Debtor deems the vendors and contractors listed in attached **Exhibit F** (the "Critical Vendor Claims") to qualify hereunder as critical and essential. For purposes of this Motion, the Debtor is seeking, authority, but not to be obligated, to pay such vendors ("Critical Vendors"), that are either Critical Vendors or hold section 503(b)(9) claims or both.

---

[1] The Debtor reserves the right to add to, renew, or otherwise supplement its Insurance Policy in its business judgment and in the ordinary course of business.

29. Failure of the Debtor to pay the prepetition payments due to these creditors may result in Critical Vendor Claimants refusing to provide post-petition services and/or goods to the Debtor, resulting in the Debtor being forced to try to obtain services elsewhere that would cause a significant delay in work, incur additional expenses, and may come at a higher price. In addition, the Critical Vendor Claimants may also have state law rights, which if exercised would damage any opportunity for the Debtor to reorganize and would be paid on an administrative priority basis under Section 503(b)(9) in any event.

30. If the Critical Vendors Motion is not granted, the Critical Vendors are likely to discontinue providing goods and services to the Debtor entirely, thereby effectively reducing the Debtor's ability to generate sales and revenue post-petition. Out of all the pre-petition claims, the Debtor believes that this list appended to the Motion represents those creditors that are necessary for the Debtor to continue with its normal operations. As noted in the Motion, the Debtor seeks authorization to pay the pre-petition claims of the Critical Vendors in the aggregate amount of up to $325,000.

31. Of particular immediate import in this case is the Debtor's critically important relationship with McLane Foodservice, Inc. ("McLane"), the Debtor's sole source of food delivery and the vendor required by the Franchisor. Prepetition, the Debtor typically ordered from McLane roughly $600,000 per month for critical food deliveries on 7 day credit terms. As of the Petition Date, McLane was owed the sum of $144,983.96 for goods delivered within the 20-day period immediately preceding the Petition Date ("McLane's Prepetition Claim"). A portion of the goods supplied by McLane are eligible "trust fund" claims under the Perishable Agricultural Commodities Act (PACA) (7 U.S.C. § 499).

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

78592902;4

32. Due to Debtor's bank accounts being frozen as a result of a dispute between the Debtor's equity holders and the bankruptcy filing, certain ACH transfers to McLane were not effectuated. As a result of the failed ACH transfers and the Debtor's lack of access to cash, McLane was unable to make continued postpetition shipments. Fortunately, on October 31, 2014, McLane reached an agreement with the Secured Lender and Debtor pursuant to which McLane agreed to ship product to the Debtor as set forth below. Pursuant to this agreement, (A) Secured Lender agreed to (i) a carveout in the amount of $144,983 for McLane's Prepetition Claim and (ii) use of cash collateral for payment of McLane's postpetition claims in an amount not to exceed to $261,085; (B) McLane agreed in writing to continue to supply the Debtor postpetition (provided McLane did not commit to any additional extension of postpetition credit that would exceed the postpetition cash collateral amounts carved out by the Secured Lender as referenced above); and (C) the Debtor agreed to seek authority from the Court no later than November 5, 2024 to make immediate payment on account of McLane's Prepetition Claims and to provide for McLane's postpetition claims to be paid pursuant to the cash collateral budget.

33. **Employee Obligations Motion**. As of the Petition Date, the Debtor's workforce consists of approximately 25 full time, 270 part time, and 5 per diem (the "1099s employees") (collectively, the "Employees"). There are approximately 885 employees available to work the available hours.

34. The Debtor maintain various compensation and benefits programs and pay various administrative fees and premiums in connection therewith. The vast majority of Employees rely exclusively or primarily on the Employee Compensation and to pay their daily living expenses and

support themselves or their families. Thus, Employees will face significant financial consequences if the Debtor is not permitted to continue the Employee Compensation in the ordinary course of business. The Debtor seeks to minimize the personal hardship the Employees would suffer if employee obligations are not paid when due or as expected. Consequently, the relief requested is necessary and appropriate.

35. By this Motion, the Debtor further requests confirmation of its right to modify, change, and discontinue any of its Employee Compensation and to implement new programs, policies, and benefits in the ordinary course of business during these chapter 11 cases, in each instance, in its discretion and without the need for further Court approval, subject to any agreements executed in contemplation of these chapter 11 cases and the requirements of the Bankruptcy Code.

36. The Debtor pays Employees' wages and other compensation (excluding reimbursable expenses, bonuses and paid leave) on a bi-weekly basis (collectively, the "Employee Compensation"). Because the Debtor's Employees are paid in arrears, Employees will be owed accrued but unpaid Employee Compensation as of the Petition Date. In 2023, the Debtor spent an average of approximately $600,000 per month on Employee Compensation

37. As of the Petition Date, the Debtor estimates that the amount of accrued but unpaid obligations owed to Employees is approximately $350,000 with respect to the current payroll period on account of Employee Compensation, all of which will come due during the interim period. This amount is inclusive of all processing and other associated fees.

38. The Debtor offers self-insured medical insurance coverage to its eligible fulltime and part-time Employees and their dependents administered through ADP and Aetna's PPO (the "Medical Plan"). On average, the Debtor funds approximately 100% of the monthly costs associated with the medical coverage, and employee deductions fund none of the monthly costs. The Debtor's monthly

costs for the Medical Plan over the last 12 months are in the amount of $10,800—prior to stop loss coverage—as the cost fluctuates based on Employees' usage of medical services that month.

39. The Debtor, therefore, seeks authority, but not direction, to pay the prepetition Employee Compensation on an interim basis and to continue to honor any such obligations in the ordinary course of the Debtor's business on a post-petition basis.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true to the best of my knowledge, information and belief.

Dated this 5 day of November, 2024.

_____
Shahvand Aryana